UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 17-80078-CIV-MATTHEWMAN

ANGELA C. BRONSON,

      Plaintiff,

v.

NANCY A. BERRYHILL,
Acting Commissioner of Social
Security Administration,

      Defendant.
_____/



FILED by _____ D.C.

FEB 2 6 2018

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT [DEs 22, 23]

THIS CAUSE is before the Court upon Plaintiff, Angela C. Bronson's ("Plaintiff") Motion

for Summary Judgment [DE 22], and Defendant, Nancy A. Berryhill, Acting Commissioner of

Social Security Administration's ("Defendant") Motion for Summary Judgment [DE 23].    The

parties have consented to magistrate judge jurisdiction.    [DEs 16, 17].    Plaintiff has filed a Reply

[DE 25], and the matter is now ripe for review.    The issue before the Court is whether the record

contains substantial evidence to support the denial of benefits to the Plaintiff and whether the

correct legal standards have been applied.    *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

## I. FACTS

On January 16, 2014, Plaintiff filed an application for supplemental security income,

alleging disability beginning on March 9, 2013.    [R. 42].[1]    The claim was denied initially and

upon reconsideration.    *Id.*    Following a hearing on September 3, 2015 the ALJ issued a decision

on December 3, 2015, denying Plaintiff's request for benefits.    [R. 42-79].    A request for review

_____

[1] All references are to the record of the administrative proceeding filed by the Commissioner in Docket Entry 14.

1

was filed with the Appeals Council and denied on November 21, 2016. [R. 1-6].

## A. Hearing Testimony

The ALJ held a hearing on September 3, 2015. [R. 86]. Plaintiff testified that she was born on May 25, 1970, and was 45 years old at the time of the hearing. [R. 92]. She has a driver's license, but does very little driving because it is hard for her to turn her neck. Plaintiff graduated from high school and took one adult education class. *Id.* She most recently worked as a merchandiser on March 9, 2013, right before her accident. [R. 93]. The accident occurred while she was placing the labels on a shelf, and a supervisor, who was above her on a ladder, dropped the shelving and all of the equipment onto her. *Id.* Plaintiff did not work from 2000 to 2011 because her children were young. *Id.*

Plaintiff testified that she is unable to work because she has difficulty using her hands because they are numb and tingle, she has pinched nerves in her neck, she cannot hold her head up for very long before she needs to rest it, she has weakness in her right hand that prevents her from lifting things, typing, or writing, she has nerve damage in both arms and her neck, she needs surgery on ripped tendons and tissue in her right arm, and she has carpal tunnel. [R. 93-94]. Plaintiff also stated that she cannot lift her hands over her head or behind her and cannot bend forward with the weight of her head. [R. 105]. She wears a brace on her right wrist and hand to keep her elbow and thumb supported. [R. 94]. Plaintiff is supposed to wear a brace on her right elbow if it starts to swell or bother her too much. *Id.* She also wears a neck brace to keep the pressure off her nerves. *Id.* All three braces were prescribed by doctors. *Id.*

Plaintiff explained that she cannot stand for long periods of time, and that, while she can walk, she gets tired easily because her head feels heavy. [R. 94]. She has a hard time even lifting a glass of water and cannot lift a gallon of milk. *Id.* At the time of the hearing, Plaintiff was

2

taking several medications that helped with her pain but made her tired, confused, and forgetful, and also slurred her speech. [R. 95-96]. On a typical day, Plaintiff mostly sleeps. [R. 96]. When she tries to do things, she becomes anxious and takes an anxiety pill. *Id.* Plaintiff also spends some of the day looking for misplaced items and walking around the house or outside. [R. 100]. She sets alarms to help her remember activities and tasks. *Id.* Plaintiff's pain prevents her from sleeping through the night. *Id.*

Plaintiff lives with her three children. [R. 96]. One daughter had to be home-schooled so that she could help Plaintiff and drive her places. *Id.* Plaintiff's husband filed for legal separation, and Plaintiff and her children move from house to house. *Id.* Plaintiff cannot do household chores because she cannot push anything. *Id.* Her children cook and clean. *Id.* Plaintiff used to be very active, but her physical impairments have caused her to go into a deep depression and become suicidal because she can no longer have the same involvement in her children's lives. [R. 96-97]. Plaintiff cannot do her hair or take a shower without her daughter's help. [R. 105].

Plaintiff testified that her anxiety can make her feel like she cannot breathe and is having a heart attack. [R. 97]. She gets irritable with her children, and this leads to episodes of depression where she goes to her bed, cries, and thinks bad thoughts. *Id.* Plaintiff began having suicidal thoughts a little over a year before the hearing when she became unable to babysit her niece. [R. 98]. Plaintiff testified that she had been seeing a psychiatrist, Dr. Shiada, once a month for two years and that Dr. Bukstel wanted her to see a psychologist as well. *Id.* However, Plaintiff testified that she was not currently seeing a therapist or counselor. *Id.*

Plaintiff stated that, before the work accident, she was completely healthy and had no problems with her neck or hands. [R. 99]. She tried physical therapy but had to discontinue it

3

when it caused bad migraines. *Id.* Plaintiff also tried cortisone shots and epidurals in her neck, but they did not work. *Id.* She had surgery in her right arm, which helped with the swelling and fluid, but the nerve damage still affects her thumb. *Id.* Plaintiff's doctor will not do surgery on her neck. *Id.* Plaintiff testified that her medications for depression and anxiety help with her mental issues. [R. 99].

Theresa Wolford, the vocational expert, testified at the hearing. [R. 101]. The ALJ first posed a hypothetical in which an individual of the same age, education, and past work experience as Plaintiff could work at the light exertional level, but could never climb ladders or scaffolds, could frequently (but not constantly) reach in all directions with both upper extremities, could frequently (but not constantly) perform fingering and handling with both upper extremities, needed to avoid concentrated exposure to hazards such as unprotected heights and moving mechanical parts, was limited to understanding, remembering, and carry out simple instructions, was limited to occasional interaction with supervisors, coworkers, and the public, could only make simple work-related decisions, and could only tolerate occasional changes in work locations. [R. 102-3]. The vocational expert explained that such an individual could perform the tasks of cleaner/housekeeping, routing clerk, and mail clerk. [R. 103].

For the second hypothetical, the ALJ stated that the individual had all of the same limitations from the first hypothetical, but would also need to take one or two unscheduled breaks per workday of around 15 minutes per break, in addition to the two regularly scheduled breaks. [R. 103]. The vocational expert explained that the DOT does not address breaks, so she had to form an opinion based on her experience. *Id.* She opined that, if the individual would have to take the unscheduled breaks on a long-term and daily basis, that individual would not be able to maintain competitive level employment. *Id.*

4

Plaintiff's counsel posed a third hypothetical to the vocational expert in which an individual was limited to occasional use of the bilateral hands for fine manipulation, could frequently use the bilateral hands for gross manipulation, was limited to occasional raising of the bilateral arms over shoulder height, was limited to occasional lifting and carrying of up to ten pounds, and could not lift or carry anything over ten pounds. [R. 104]. The vocational expert opined that there would not be any competitive level employment for such an individual. *Id.*

B. Medical Record Evidence

In reaching his decision to deny Plaintiff's benefits, the ALJ reviewed the medical evidence of record, the relevant portion of which is summarized chronologically below.

On January 18, 2013, Plaintiff saw Dr. Diana Fischer regarding her depression. [R. 373]. Plaintiff reported that she was doing better, but still suffering from depression. *Id.* Dr. Fischer increased Plaintiff's medication. *Id.* The psychiatric exam was normal. *Id.* Dr. Fischer noted that Plaintiff suffered from panic disorder and obsessive-compulsive disorder, had economic and other psychosocial and environmental problems, and had a GAF of 51-60. [R. 374].

On March 21, 2013, Plaintiff presented to Dr. Railton L. Green after she suffered her injury at work on March 8, 2013. [R. 345]. Plaintiff reported that, since the accident she had been suffering from constant headaches and neck pain that radiated to both arms. *Id.* Pain medication was not helping her, and she had not been back to work. *Id.* Upon examination, Dr. Green noted that everything appeared normal except that Plaintiff's cervical range of motion was decreased to all planes with pain mildly, and palpation of the cervical spine was positive for minimal tenderness in the bilateral trapezius. [R. 346]. Dr. Green diagnosed Plaintiff with cervical strain and a face/scalp contusion. [R. 347]. He noted that Plaintiff's subjective complaints did not correspond to the objective clinical findings. *Id.* Dr. Green told Plaintiff that she should respond

5

to conservative treatment and prescribed physical therapy. *Id.* Dr. Green determined that Plaintiff's activity should be modified, and she should not lift over five pounds or push or pull over 20 pounds. *Id.*

Plaintiff saw David Kronzek, Dr. Green's physician's assistant, on April 12, 2013, for a re-check of the injury. [R. 342]. Plaintiff reported that, when she flexed her head forward, it caused dizziness and sharp pain in her head. *Id.* PA Kronzek's examination showed no change from the March 21, 2013 examination. *Id.* He found that Plaintiff's activity should be modified since she could lift no more than 10 pounds. [R. 344].

Plaintiff presented to David Kronzek, Dr. Green's physician's assistant, again on May 13, 2013, and reported that she was not working because there was no light duty available. [R. 341]. She also stated that physical therapy was making her sick and giving her blurred vision. *Id.* Plaintiff reported numbness and tingling in her left hand, as well as a pain level of 5 out of 10. *Id.* The physical examination did not show any new issues. *Id.* PA Kronzek noted that Plaintiff had gotten a CT scan of the brain, which was negative, and an electromyogram test and nerve conduction study of her left hand, which were both negative. [R. 342]. PA Kronzek advised Plaintiff that they were running out of treatment options and that she could get another opinion. *Id.* He noted that Plaintiff's subjective complaints outweighed the objective exam. *Id.*

On May 24, 2013, Plaintiff presented to MedExpress Royal Palm Beach and was seen by Jeanine Darquea, PA-C. [R. 350]. Plaintiff reported headaches and pain in her neck and shoulder due to her March 8th work accident. *Id.* She explained that medication and six sessions of physical therapy had not relieved her pain. *Id.* The physical examination was normal except that Plaintiff had painful full range of motion during flexion and extension of the neck bilaterally, painful full range of motion during rotation in the right neck, limited rotation in left neck due to

pain, paraspinous tenderness and lateral tenderness in the neck, abnormal range of motion in the shoulder, pain noted on palpation of the posterior shoulder, and tenderness and stiffness in the left side of the neck. *Id.* Plaintiff was diagnosed with radiculopathy of the arm, a sprained or strained neck, headaches, and an unspecified head injury. [R. 352]. She was prescribed medication. *Id.*

On June 3, 2013, Plaintiff had an MRI of the cervical spine without contrast performed. [R. 360]. She was found to have a herniated disc with bony ridging at the C3-4, C4-5, and C5-6 levels, a bulging disc at the C6-7 level, and straightened alignment suggesting muscle spasm. *Id.* The radiologist also noted that the "agent of injury is chronic." *Id.*

On June 5, 2013, Plaintiff returned to MedExpress and was seen by Dr. Sophia Salmon-Trajan. [R. 353]. Plaintiff reported that she still had pain on the left side of her neck and in her left thumb and that the pain had become more constant. *Id.* The physical examination was normal except for lateral tenderness noted on the left side of Plaintiff's neck. [R. 354]. Dr. Salmon-Trajan completed a Florida Workers' Compensation Uniform Medical Treatment/Status Reporting Form [R. 356-59] at the June 5th visit. The doctor opined that Plaintiff could perform "desk work only." [R. 357, 359].

On June 18, 2013, Plaintiff saw Dr. Gary Ackerman for her neck pain, numb hands, neck spasms, and headaches. [R. 364]. He examined Plaintiff and noted that Plaintiff had normal gait, inspection, and palpation, pain and decreased range of movement of the cervical spine, full range of movement in the thoracic spine and lumbar spine, and an otherwise normal examination. *Id.* Dr. Ackerman recommended NSAID pain medication and possibly an epidural. *Id.* Plaintiff saw Dr. Ackerman again on July 15, 2013, and he recommended a cervical epidural. [R. 363].

On January 7, 2014, Plaintiff saw Dr. Fischer, who conducted a psychiatric examination. [R. 377]. The examination was normal. *Id.* Plaintiff reported that she planned to return to counseling. *Id.*

On February 19, 2014, Plaintiff presented to Dr. David Simpson complaining of neck pain. [R. 368]. Plaintiff explained that physical therapy, medications, and epidural injections had all failed to provide significant relief of her neck pain radiating into the left arm with numbness and tingling in the hand. *Id.* Dr. Simpson examined Plaintiff. *Id.* The only abnormality was tenderness in the left trapezius. *Id.* Dr. Simpson reviewed Plaintiff's June 3, 2013 MRI and noted that she had multilevel disc herniations with osteophyte formation causing central and foraminal narrowing. [R. 369]. Because conservative treatment had not worked for Plaintiff, he referred her for a neurosurgical evaluation. *Id.*

On March 4, 2014, Plaintiff saw Dr. Fischer, and Plaintiff's psychiatric exam was normal. [R. 375].

On March 11, 2014, Plaintiff presented to Dr. Pedro Nam for increased tiredness and fatigue that was not improving. [R. 382]. She also complained of diffuse joint tenderness and muscle pain. [R. 383]. Dr. Nam advised Plaintiff to continue taking her muscle relaxant and anti-inflammatory for her neck pain. *Id.* He also advised her to continue taking her present medication for her atypical depressive disorder as she was stable on the medication. *Id.* Dr. Nam noted that Plaintiff was doing well and scored less than a 4 on her depression screening. *Id.*

On March 28, 2014, a Disability Determination Explanation at the initial level was issued. [R. 127-37]. Rodolfo Buigas, Ph.D., P.A., concluded that Plaintiff's claim was partially credible and that the medical evidence of record corroborated Plaintiff's anxiety, but not her alleged PTSD and depression. [R. 131]. He also noted that the evidence showed improvement with treatment,

that functioning was overall intact, and that Plaintiff had mild limitations in acts of daily living and social functioning. *Id.* In the Disability Determination Explanation, Charlotte Townes, SDM, concluded that Plaintiff is not disabled. [R. 137].

Plaintiff saw Dr. Nam again on April 11, 2014. [R. 380]. Dr. Nam noted that Plaintiff was again complaining of diffuse joint tenderness, muscle pain, fatigue and weakness. *Id.* He also noted that Plaintiff had diffuse trigger point tenderness. *Id.* He referred Plaintiff to a rheumatologist. *Id.*

On May 5, 2014, Plaintiff presented to Dr. Stephen Gervin complaining of neck pain that she said was a 6 out of 10 on the pain scale. [R. 395]. She reported excessive fatigue, night sweats, headaches, loss of sleep, depressive disorder, forgetfulness, nausea and vomiting, arm or leg weakness, joint pain, memory impairment, difficulty in speech, an issue with coordination in her arm, an inability to concentrate, diplopia, weakness of the face muscles, anxiety, depression, obsessive-compulsive disorder, panic attacks, increased appetite, and persistent swollen glands or lymph nodes. [R. 395-96]. Plaintiff told Dr. Gervin that she had quit her job and that the only doctor she was currently seeing was a therapist. [R. 396-97]. Plaintiff also stated that she had no "depressive problems" prior to her accident. [R. 397]. Dr. Gervin examined Plaintiff and noted that she tended to cradle her left arm in her lap. *Id.* He also noted that she had normal gait and coordination. *Id.* The examination was generally normal. [R. 397-98]. Dr. Gervin also reviewed Plaintiff's diagnostic studies. [R. 398]. He diagnosed Plaintiff with brachial neuritis or radiculitis NOS, brachial neuritis, cervicalgia, and neck pain. [R. 399]. Dr. Gervin noted that Plaintiff's spine was mechanically intact except for extension was 15 degrees. *Id.* He also noted that her muscles were very tense, but that her motor, sensory, and reflexes were intact, and her toe signs were down. *Id.* Dr. Gervin ordered additional studies. [R. 399-400].

Plaintiff had an MRI and an x-ray of the cervical spine performed on May 6, 2014. [R. 405-6]. They showed small disc protrusions most significant at C4-C5 where a small left paramedian disc protrusion was in contact with the cord and mild degenerative disc interspace narrowing at C4-C5 and C5-C6. *Id.*

On May 12, 2014, Plaintiff saw Dr. Gervin for a follow-up. [R. 109]. Dr. Gervin examined Plaintiff and noted that she still tended to cradle her left arm in her lap. [R. 110]. He also noted that she had normal gait and coordination. *Id.* Dr. Gervin determined that Plaintiff's spine was intact mechanically except that extension was 15 degrees, her muscles were very tense, her motor, sensory and reflexes were intact, and her toe signs were down. [R. 111]. The doctor reviewed Plaintiff's x-rays and MRI's from May 6, 2014. *Id.* Dr. Gervin concluded that Plaintiff had very mild spondylitic intrusion into the canal to the left of center at 4-5 and 5-6 and that it did not appear to be neuro-compressive. *Id.* He diagnosed her with anterolateral disc herniation to the left at C4-5 and discussed treatment options. [R. 112]. Dr. Gervin ordered a cervical sensory nerve conduction study and a cervical brace. *Id.*

On June 4, 2014, a Disability Determination Explanation at the reconsideration level was issued. [R. 140-54]. Thomas Conger, Ph.D., explained that, while Plaintiff alleged that her condition had worsened since the prior denial, the updated functional evidence did not support her allegation and, instead, confirmed that she was capable of performing a wide range of activities of daily living within her physical restrictions. [R. 147]. Dr. Conger also determined that Plaintiff's functional input is only partially credible, and that a review of the evidence confirmed that she was primarily limited by her physical condition and there was no indication of a mental impairment that would meet or equal any listing. *Id.* Thomas Bixler, M.D., also found that Plaintiff was only partially credible and that the RFC was reduced for pain and radiculopathy. [R.

151].  Lysle McCown concluded that Plaintiff is not disabled.  [R. 154].

Plaintiff saw Dr. Gervin on June 16, 2014, for a re-check.  [R. 423].  She reported that she was disappointed that her insurance had turned down several treatments—a nerve test, a brace, and a nuclear magnetic resonance.  *Id.*  She also stated that she was still suffering from neck pain into her left shoulder with radicular symptoms down her left arm and tingling fingers on her left hand.  *Id.*  Plaintiff told the doctor that her employer released her since she could not lift anything heavy and that three cervical epidurals had not helped her.  *Id.*  Upon physical examination of Plaintiff, Dr. Gervin found that Plaintiff had a fluid gait, no signs of spasticity, an intact mechanical spine except for extension of 15 degrees, and very tense muscles.  [R. 424].  He cautioned Plaintiff not to cradle or favor a particular arm and discussed the option of the non-covered service for cervical neuromuscular re-education to the spine program directed at C5-6.  *Id.*

On July 16, 2014, Plaintiff had electromyography and nerve conduction velocity tests performed.  [R. 427].  She was found to have right median sensory neuropathy, right ulnar motor and sensory neuropathy, evidence of acute left C5-6 and C6-7 radiculopathy, and evidence of chronic right C5-6 and C6-7 radiculopathy.  *Id.*

On September 8, 2014, Plaintiff presented to Dr. Evlyn Brown for an annual physical and reported pain in her back and elbow radiating into both of her legs.  [R. 492].  Dr. Brown conducted a depression screening and gave Plaintiff a score of 7, which meant that Plaintiff suffered from minor depression.  *Id.*  Dr. Brown noted that Plaintiff's depressive disorder was stable with medications.  [R. 494].  She also refilled Plaintiff's pain medication.  *Id.*

On September 19, 2014, Plaintiff had an MRI of the cervical spine without contrast performed.  [R. 433].  She was found to have minimal reversal of the cervical lordosis, moderate degenerative disc disease at C3-4 through C5-6, and multilevel shallow disc protrusions/disc bulge

with annular fissuring, worst at C4-5 with mild primarily left-sided cord compression and displacement but not significant canal or neural foraminal stenosis. [R. 434].

On September 24, 2014, Plaintiff presented to Dr. Brian Reiter with right elbow pain. [R. 452]. She stated that the pain had started four months prior. *Id.* Plaintiff also reported neck pain. *Id.* Dr. Reiter examined Plaintiff's right elbow and found that she had signs and symptoms of tennis elbow, neuropathy, and possible carpal tunnel syndrome. *Id.* He performed diagnostic/therapeutic injections for the tennis elbow and for the ulnar nerve to see if Plaintiff's symptoms improved. *Id.*

On November 5, 2014, Plaintiff returned to Dr. Reiter for a re-check of her elbow pain. [R. 455]. Plaintiff stated that the injections only worked for two days and that the pain had returned. *Id.* Dr. Reiter performed a second injection for the tennis elbow and recommended physical therapy and a tennis elbow strap. [R. 456].

On November 25, 2014, Plaintiff saw Dr. Brown for a rash all over her body that appeared after Plaintiff did yard work. [R. 490]. Dr. Brown prescribed medication. [R. 491].

On January 5, 2015, Plaintiff returned to Dr. Reiter for a re-check of her elbow pain. [R. 457]. Plaintiff reported that her most recent cortisone injection had only offered her partial and temporary relief for a couple of days and that she had to stop physical therapy because the pain was unbearable. *Id.* Dr. Reiter examined Plaintiff's elbow and noted that she had symptoms of tennis elbow, but also some mild diffuse tenderness around the elbow. [R. 458]. He also noted that the tenderness localized over the lateral upper condyle. *Id.* The doctor ordered an MRI. *Id.*

On January 22, 2015, Plaintiff had an MRI of the right elbow without contrast performed. [R. 407]. It was determined that she had lateral epicondylitis with tendinosis and a partial tear of the common extensor tendon, as well as a mild sprain type injury of the radial collateral ligament.

*Id.*

On January 28, 2015, Plaintiff saw Dr. Reiter for a re-check of her elbow pain and to review the MRI. [R. 459]. Dr. Reiter noted that Plaintiff had a somewhat positive Tinel's sign at the right elbow and discomfort on the medial side of the elbow. [R. 460]. He also noted that Plaintiff had clinical and MRI findings for lateral epicondylitis and that conservative treatment had not worked. *Id.* Dr. Reiter explained to Plaintiff that she had carpal tunnel, cubital tunnel, and possible cervical radiculopathy, and he suggested surgery. *Id.* Plaintiff consented to surgery. *Id.* On February 24, 2015, Dr. Reiter performed debridement of the extensor tendon, right elbow, and application of a long posterior long arm splint to treat Plaintiff's right elbow lateral epicondylitis. [R. 444]. On March 5, 2015, Plaintiff saw Dr. Reiter for a post-operative visit. [R. 462]. He noted that she was doing well and that her symptoms were slightly improved. *Id.* He also noted that Plaintiff would be starting physical therapy. [R. 463].

On April 3, 2015, Plaintiff saw Dr. Jose Labault-Santiago for an evaluation of the numbness and pain in her hands. [R. 436]. Plaintiff reported that she was limited in her ability to write and that she had some memory loss and decreased focus. *Id.* She also stated that physical and occupational therapy had increased her vomiting and pain. *Id.* Plaintiff scored a 16 out of 30 on a mini-mental state exam because of her decreased attention and concentration. [R. 437]. After completing a physical exam on Plaintiff, Dr. Labault-Santiago noted that everything was normal except for giveaway weakness secondary to pain. [R. 438]. He determined that Plaintiff suffered from radiculopathies and carpal tunnel. *Id.* He started Plaintiff on conservative management to include physical/occupational therapy and preventative medication for the pain. [R. 438]. The doctor also found that Plaintiff's memory deficit was most likely caused by depression and anxiety. *Id.* He advised Plaintiff to continue seeing a psychiatrist. *Id.*

On April 15, 2015, Plaintiff saw Dr. Reiter. [R. 464]. Dr. Reiter noted that, while there had been no post-operative complications, Plaintiff's symptoms were unchanged compared to preoperative symptoms. *Id.* Plaintiff reported that she was doing okay, that some days were more painful than others, particularly if she was active, and that she had not yet started physical therapy. *Id.* Upon examination, Dr. Reiter noted that Plaintiff had full range of motion in her elbow and there was mild tenderness to palpation. [R. 465].

On May 11, 2015, Dr. Lee H. Bukstel completed a "Preliminary Report." [R. 573]. The doctor noted that Plaintiff was currently being treated by a psychiatrist, but that she had been treated by other psychologists and psychiatrists in the past. [R. 574]. Dr. Bukstel opined that the available evidence raised concerns that Plaintiff could have some kind of cognitive disorder. [R. 575]. He explained that she may have sustained a mild concussion or traumatic brain injury during her 2013 work accident. *Id.* Dr. Bukstel opined that "[o]ther secondary influences that could also contribute to cognitive inefficiency are anxiety, pain, sleep disturbance, hearing loss, and tiredness. It is also difficult to know to what extent, if any, being on multiple medications could contribute to some cognitive inefficiency." *Id.* Dr. Bukstel recommended that Plaintiff be evaluated from a "neuropsychological standpoint." *Id.*

On May 29, 2015, Dr. Labault-Santiago completed a Medical Source Statement (Physical). [R. 414-415]. He noted that Plaintiff suffered from limitation of movement of the arms due to pain and that she could not stand for long periods. [R. 414]. The doctor opined that Plaintiff could not work on a regular basis without missing more than two days a month due to her disabilities. *Id.* He also found that Plaintiff could not stoop or climb, could not stand for long periods of time, could only occasionally lift or carry up to 10 pounds, could only occasionally use her hand for fine manipulation, and could only occasionally raise her left and right arms over her

shoulders. *Id.* Dr. Labault-Santiago also found that Plaintiff's pain was both extreme and severe, that she had to periodically lie down due to fatigue (but did not say for how long), and that she would need to take unscheduled break periods during an eight-hour work day. [R. 415].

Dr. Labault-Santiago also completed a second undated Medical Source Statement (Physical). [DE 439-40]. The only differences in the undated version are that Dr. Labault-Santiago replied that Plaintiff could frequently (rather than occasionally) use her hands for fine manipulation, that Plaintiff's pain level was severe (rather than extreme and severe), and that Plaintiff did not have a reasonable medical need to lie down. *Id.*

On May 29, 2015, Dr. Brown also completed a Medical Source Statement (Physical). [R. 416]. She noted that Plaintiff had nerve damage that caused her to have pain and numbness radiating down her right and left arm and into her hands and fingers. *Id.* Dr. Brown opined that Plaintiff could not work on a regular basis without missing more than two days a month due to her disabilities. *Id.* She also found that Plaintiff had limitations sitting, standing, walking, stooping and climbing. *Id.* Dr. Brown concluded that Plaintiff could frequently lift or carry up to five pounds and could only occasionally lift or carry up to 10 pounds, could never use her hands for fine manipulation, could only occasionally use her hands for gross manipulation, could only occasionally raise her left arm over her shoulder, and could never raise her right arm over her shoulder. *Id.* Dr. Brown also found that Plaintiff's pain was both extreme and severe, that she had to elevate her legs as needed, that she had to lie down due to fatigue as needed, and that she would need to take unscheduled break periods during an eight-hour work day. [R. 415].

On June 22, 2015, Plaintiff saw Dr. Reiter for her elbow pain. [R. 466]. Plaintiff reported some improvement, but stated that the pain was exacerbated by certain movements. *Id.* Plaintiff had not yet started physical therapy. *Id.* Plaintiff still had some tenderness and

tightness, but it was better than prior to surgery. *Id.* Upon examination, Dr. Reiter noted that Plaintiff had full range of motion and there was mild tenderness to palpation. [R. 467]. He strongly recommended to Plaintiff that she start physical therapy. *Id.*

On September 2, 2015, Dr. Bukstel completed his "Brief Preliminary Neuropsychological Report." [R. 576]. He noted that Plaintiff had been seen for a neuropsychological evaluation due to her memory loss and other cognitive impairment. *Id.* Dr. Bukstel also noted that Plaintiff appeared quite depressed. *Id.* He explained that testing showed a pattern of many intact abilities, generally within the low average to average range, and some deficits that are generally mild. *Id.* Dr. Bukstel noted that Plaintiff had some slight perseverative thinking tendency and some inefficiency on short delay free recall and long delay recognition recall. *Id.* He also noted that Plaintiff made multiple intrusion and repetition errors and had deficits in the areas of reading and expressive vocabulary, verbal symbolic abstract reasoning, rhythm pattern perception, left hand simple motor speed, bilateral fine motor dexterity, simple visual executive functioning, auditory comprehension of verbal material, verbal fluency for phonemic and conceptual cutes, and verbal confrontation naming. [R. 577-78]. Dr. Bukstel found that there was also evidence of moderate inadequacy of explaining a simple statement heard and mild errors of confusion in calculating. [R. 578].

Dr. Bukstel next reported that psychological screening of Plaintiff revealed evidence of severe depression with some suicide preoccupations, severe anxiety, and severe hopelessness regarding the future. [R. 578]. He explained that Plaintiff had many notable stressors. *Id.* Dr. Bukstel concluded that evidence showed selected neuropsychological impairment. *Id.* He found that Plaintiff's neuropsychological inefficiency is likely multi-factorial, caused by her severe depression and anxiety, chronic pain, sleep disturbance, daytime fatigue and tiredness, and left ear

16

hearing loss. *Id.* Dr. Bukstel pointed out that some of Plaintiff's motor deficits could be related to her neck injury and some of her other deficits could be longstanding in nature. *Id.* He stated that the March 2013 accident may have caused a mild concussion, which could account for some of the inefficiencies, but that there was no obvious evidence of any type of dementing process. *Id.* Dr. Bukstel concluded that Plaintiff's "neurophysical inefficiency is likely mostly due to non-neurologic factors" and that continued neurological monitoring might be necessary. *Id.* He also recommended that Plaintiff continue to see her psychiatrist, take her prescribed medications for depression and anxiety, get a review of her psychotropic medication, and seek psychotherapy. *Id.* Dr. Bukstel opined that Plaintiff would likely have trouble being gainfully employed (at the time of his report), but that, if her depression, anxiety and pain improved with treatment, she could possibly return to work. *Id.*

Plaintiff saw Dr. Womesh Sahadeo on multiple occasions in 2014 and 2015 for psychiatric care. [R. 413, 477-84]. While the hand-written notes are generally illegible, Dr. Sahadeo did find that Plaintiff did not suffer from psychosis, suicidal ideation, homicidal ideation, or hallucinations. [R. 408, 477]. The doctor also found that Plaintiff's impulse control and insight/judgment were fair and her affect was blunted. [R. 408-413]. On one occasion the doctor found Plaintiff's mood to be poor. [R. 478].

On July 17, 2016, Plaintiff presented to JFK Medical Center reporting that she was very depressed, suffered from OCD, and had thoughts of dying or killing herself. [R. 9]. It was noted that Plaintiff was very difficult to manage psychiatrically. *Id.* Plaintiff was admitted to the hospital. [R. 10]. Plaintiff stated that she had put a gun to her head, but she denied any physical attempt at suicide. [R. 11]. On July 23, 2016, Plaintiff was discharged from the hospital as she was doing "much, much better" and requested that she be discharged. [R. 21]. It was noted that

Plaintiff was no longer suicidal or psychotic and had reached her baseline after receiving therapy and an increased dosage of Abilify. [R. 21-29].

## C. ALJ's Decision

The ALJ issued a decision on Plaintiff's claim for benefits on December 3, 2015. [R. 42-79]. The ALJ explained the five-step sequential evaluation process for determining whether an individual is disabled. [R. 42-44]. The ALJ found that Plaintiff has not engaged in substantial gainful activity since January 16, 2014, the alleged onset date. [R. 44]. The ALJ then found that Plaintiff suffers from the following severe impairments: degenerative disc disease of the cervical spine, right elbow lateral epicondylitis post debridement, neuropathy in the right upper extremity, anxiety and depression. *Id.* The ALJ specifically noted that Plaintiff's gastritis is a non-severe medically diagnosed impairment. *Id.*

The ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. [R. 45]. The ALJ further determined that the severity of Plaintiff's mental impairments, considered singly and in combination did not meet or medically equal the criteria of listings 12.04 and 12.06 as Plaintiff has mild restrictions in activities of daily living, moderate difficulties in social functioning, moderate difficulties with regard to concentration, persistence or pace, and no episodes of decompensation of an extended duration. [R. 45-46]. The ALJ also found that the listing 12.04 "paragraph C" criteria has not been met in this case. [R. 46].

The ALJ found that Plaintiff has

the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except she (1) can never climb ladders and scaffolds; (2) can frequently, but not constantly, reach in all directions with both upper extremities; (3) can

frequently, but not constantly, finger and handle with both upper extremities; and (4) must avoid concentrated exposure to hazards such as unprotected heights and moving mechanical parts. Further, she can (1) understand, remember and carry out simple instructions; (2) have occasional interaction with supervisors, coworkers and the public; (3) only make simple, work-related decisions; and (4) only tolerate occasional change in work location.

[R. 47]. The ALJ attested that he had considered all of Plaintiff's symptoms and "the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," as well as all of the opinion evidence. *Id.* He then followed the two-step process—first, determining whether there is an underlying determinable physical or mental impairment that could reasonably be expected to produce Plaintiff's pain or other symptoms, and then evaluating the intensity, persistence, and limiting effects of Plaintiff's symptoms to determine the extent to which they limit her functions. *Id.*

The ALJ summarized Plaintiff's hearing testimony and found that the Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." [R. 48]. The ALJ specifically found Plaintiff to be "partially credible as she is subject to a degree of functional restriction as a result of her various impairments, both physical and mental. To accommodate [Plaintiff's] various impairments, the residual functional capacity is reduced accordingly...." *Id.* The ALJ also noted that the medical record evidence showed that Plaintiff went to multiple providers over the relevant period and followed up a few times or not at all with each provider, that Plaintiff received only conservative treatment and management of her pain symptoms, and that Plaintiff did not consistently attend physical therapy despite many referrals for it. *Id.* The ALJ summarized the medical record evidence regarding Plaintiff's physical

impairments. [R. 48-51].

The ALJ next noted that Plaintiff's mental health symptoms were generally stable throughout the relevant period. [R. 51]. The ALJ also stated that the treatment record showed only conservative treatment that was infrequent at times. *Id.* The ALJ concluded that "the medical evidence of record reflects that [Plaintiff's] symptoms are not as limiting as alleged." *Id.* The ALJ then summarized the medical record evidence regarding Plaintiff's mental impairments. [R. 51-52].

The ALJ explicitly considered the opinion evidence and gave Dr. Green's "multiple restrictions" little weight as they were "temporary restrictions and in May 2013 Dr. Green released [Plaintiff] to regular activity." [R. 52]. The ALJ gave Dr. Salmon-Trajan's medical release little weight as Dr. Salmon-Trajan only treated Plaintiff one time, the phrase "desk work" is "not vocationally relevant," and the opinion was provided on a worker's compensation (and not a social security) form. *Id.* The ALJ also gave Dr. Nam's opinion that Plaintiff is restricted to lifting less than 10 pounds little weight as the restriction appears to be temporary and not permanent in the context of all of Dr. Nam's notes. *Id.*

The ALJ, however, gave the opinion of Dr. Bixler, a state agency medical consultant, significant weight as Dr. Bixler has subject matter expertise, and the opinion is consistent with the medical evidence of record. [R. 52]. The ALJ explicitly noted that the "above residual functional capacity is more limiting than opined to by the state agency consultant as it incorporates the evidence of the claimant's right elbow impairment, which developed after the date of the consultant's opinion." [R. 53].

Next, the ALJ gave Dr. Brown's medical source statement little weight as it was not consistent with the medical evidence of record. [R. 53]. The ALJ also gave Dr.

Labault-Santiago's undated medical source statement little weight as the record only reflects one visit with the doctor, the "short treatment history does not bolster the value of these statements," the doctor's statement was based on the April 2015 visit but was signed over a month later, the opinions "are completed on a check-list form with no rationale to support the opined-to restrictions," there is no explanation as to why the two forms are not consistent with one another, and the opinion is not consistent with the evidence of record. *Id.*

The ALJ gave the opinions of Dr. Buigas, a state agency psychological consultant, and Dr. Conger, a state agency psychological consultant at the reconsideration level, significant weight as the consultants have subject matter expertise, and the opinions are consistent with the record evidence. [R. 53]. The ALJ gave the opinion of Dr. Bukstel little weight as it was vague and unclear, and any declaration that Plaintiff is disabled is an issue reserved to the Commissioner. [R. 54]. Finally, the ALJ considered the third-party statement from Plaintiff's spouse and found that it does not establish that Plaintiff is disabled. *Id.*

The ALJ found that Plaintiff's various GAF scores in the record should only be given little weight as GAF's "do not describe specific work related limitations or objective mental abnormalities," "usually do not reflect functioning over 12 continuous months," and "consider psychological, social and occupational functioning whereas Social Security is primarily concerned with occupational functioning." [R. 54].

The ALJ found that Plaintiff's allegations are not "fully credible" as they are not fully corroborated by the medical evidence of record. [R. 54]. The ALJ noted that Dr. Green found that Plaintiff's subjective reports were not corroborated by the objective examinations, the physical examinations have not shown that Plaintiff has difficulty holding her head up for diminished muscle strength in the neck, that Plaintiff did not attend physical therapy after her right

elbow surgery, and the medical evidence of record does not support the alleged severity of Plaintiff's depression and anxiety as the "longitudinal record reflects long treatment gaps and that [Plaintiff] reported doing well and that she was stable on medications." [R. 54-55]. The ALJ also found that Plaintiff's credibility was diminished as she has "provided various accounts of how she was injured and when the pain onset." [R. 55]. The ALJ noted that Plaintiff reported her depression onset after the March 2013 injury, but she had been treated for depression prior to that time and reported it in 1995. *Id.* The ALJ further noted that Plaintiff had reported twice that she could not do yard work, yet she was treated in November 2014 for a rash that was the result of Plaintiff doing yardwork. *Id.*

The ALJ next found that Plaintiff has no past relevant work. [R. 55]. The ALJ noted that Plaintiff was 46 years old on the alleged disability onset date. *Id.* The ALJ explained that Plaintiff has at least a high school education and is able to communicate in English. *Id.* The ALJ also explained that transferability of job skills is not an issue because Plaintiff has no past relevant work. *Id.* The ALJ concluded that, considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, including cleaner, mail clerk, and routing clerk. [R. 55-56]. The ALJ found that the vocational expert's testimony was consistent with the information found in the DOT. [R. 56]. The ALJ concluded that Plaintiff has not been under a disability since January 16, 2014, through the date of the decision. *Id.*

## II. MOTIONS FOR SUMMARY JUDGMENT

In her Motion for Summary Judgment, Plaintiff makes two main arguments. [DE 22]. First, she argues that the ALJ erred in failing to contact Dr. Bukstel for clarification of his findings or ordering a consultative psychological examination. *Id.* at pp. 13-17. Second, Plaintiff argues

that the ALJ erred by not giving controlling weight to the opinions of five of Plaintiff's treating providers. *Id.* at pp. 17-20. In Defendant's Motion for Summary Judgment with Supporting Memorandum of Law and Response to Plaintiff's Motion for Summary Judgment [DE 23], she contends that the ALJ adequately developed the record regarding Plaintiff's mental impairments and that substantial medical evidence supports the ALJ's evaluation of the medical opinion evidence.

### III. LEGAL ANALYSIS

Judicial review of the factual findings in disability cases is limited to determining whether the Commissioner's decision is "supported by substantial evidence and based on proper legal standards. Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." 42 U.S.C. § 405(g); *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004) (per curiam) (internal citation omitted) (quoting *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997)). Courts may not "decide the facts anew, reweigh the evidence, or substitute [their] judgment for that of the [Commissioner]." *Phillips v. Barnhart*, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (quoting *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

The restrictive standard of review set out above applies only to findings of fact. No presumption of validity attaches to the Commissioner's conclusions of law. *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). "The [Commissioner's] failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining the proper legal analysis has been conducted mandates reversal." *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007) (quoting *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991)).

Social Security regulations establish a five-step sequential analysis to arrive at a final determination of disability. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920 (a)-(f). The ALJ must first determine whether the claimant is presently employed. If so, a finding of non-disability is made, and the inquiry concludes. 20 C.F.R. § 404.1520(b). In the second step, the ALJ must determine whether the claimant suffers from a severe impairment or combination of impairments. If the ALJ finds that claimant does not suffer from a severe impairment or combination of impairments, then a finding of non-disability results, and the inquiry ends. 20 C.F.R. § 404.1520(c).

Step three requires the ALJ to compare the claimant's severe impairment(s) to those in the listing of impairments. 20 C.F.R. § 404.1520(d), subpart P, appendix I. Certain impairments are so severe, whether considered alone or in conjunction with other impairments, that, if they are established, the regulations require a finding of disability without further inquiry into the claimant's ability to perform other work. *See Gibson v. Heckler*, 762 F.2d 1516, 1518, n. 1 (11th Cir. 1985). If the impairment meets or equals a listed impairment, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d).

Step four involves a determination of whether the claimant's impairments prevent him or her from performing his or her past relevant work. If the claimant cannot perform his or her past relevant work, then a *prima facie* case of disability is established. 20 C.F.R. § 404.1520(e). The burden then shifts to the ALJ to show at step five that, despite the claimant's impairments, he or she is able to perform work in the national economy in light of the claimant's RFC, age, education, and work experience. 20 C.F.R. § 404.1520(f); *Phillips*, 357 F. 3d at 1239. In order to determine whether the claimant has the ability to adjust to other work in the national economy, the ALJ may either apply the Medical Vocational Guidelines, 20 C.F.R. pt. 404 subpt. P, app.2, or

24

utilize the assistance of a vocational expert. *See Phillips*, 357 F. 3d at 1239-40.

A. <u>Whether the ALJ adequately developed the record regarding Plaintiff's mental impairments</u>

Plaintiff asserts that, in this case, "disability related to mental health cannot be determined on this record as there are widely varying psychological opinions, and the ALJ should have done his duty to develop the record" by either recontacting Dr. Bukstel or ordering a consultative psychological examination. [DE 22 at pp. 14-15]. Plaintiff points out that the record contains only outdated non-examining psychological opinions other than Dr. Bukstel's. *Id.* at p. 15. Plaintiff argues that the ALJ should not have given the opinions of the non-examining State agency psychologists the most weight, but rather should have asked Dr. Bukstel to elaborate as to specific functional limitations. *Id.* Plaintiff argues that the evidence shows that Plaintiff's mental health deteriorated over time, so old opinions should not have been relied upon. *Id.* Next, Plaintiff asserts that the ALJ improperly interpreted Dr. Bukstel's report and cherry picked information from it. *Id.* at pp. 15-16.

Defendant argues that the ALJ did meet his basic obligation of developing a full and fair record regarding Plaintiff's mental impairments. [DE 23 at p. 5]. Defendant asserts that the ALJ had enough information to make a reasonable determination regarding Plaintiff's disability status, as required. *Id.* Defendant points out that the ALJ reviewed hundreds of pages of records, including treatment notes from Plaintiff's treating psychiatrists, the reports form Dr. Bukstel, and the reports from the state agency psychological consultants, and then based his decision on the adequately developed record. *Id.* at p. 6. Defendant maintains that the only ambiguity that the ALJ found in Dr. Bukstel's opinion was whether Plaintiff would have difficulty working or was entirely unable to work; Defendant maintains that this lack of clarity was immaterial. *Id.*

Defendant further asserts that "the regulations specifically provide that the absence of an opinion regarding functional limitations does not render a medical report incomplete" and that the "determination of whether to obtain a consultative examination is discretionary" in cases where there is sufficient evidence for the ALJ to make an informed decision. *Id.* at p. 7.

In reply, Plaintiff argues that the ALJ did not develop a full and fair record as he "cherry picked information from Plaintiff's treating providers, unjustifiably discounted the majority of their opinions, and relied on state agency opinions in an impermissible way." [DE 25 at p. 1].

The ALJ has a "basic obligation to develop a full and fair record, and must develop the medical record for the twelve months prior to the claimant's filing of her application for disability benefits." *Smith v. Comm'r of Soc. Sec.*, 501 F. App'x 875, 878 (11th Cir. 2012) (citing *Ellison v. Barnhart,* 355 F.3d 1272, 1276 (11th Cir.2003)). The Social Security regulations state in relevant part that, if the claimant's evidence is incomplete or inconsistent, the ALJ may need to take additional actions, including, but not limited to, re-contacting the claimant's medical source or asking the claimant to undergo a consultative examination. 20 C.F.R. § 404.1520b. "The administrative law judge has a duty to develop the record where appropriate but is not required to order a consultative examination as long as the record contains sufficient evidence for the administrative law judge to make an informed decision." *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1269 (11th Cir. 2007) (citing *Doughty v. Apfel,* 245 F.3d 1274, 1281 (11th Cir. 2001)).

"While the ALJ has a basic duty to develop a full and fair record, the claimant bears the burden of proving that he is disabled, and he is responsible for producing evidence in support of his claim." *Bischoff v. Astrue*, No. 07-60969-CIV, 2008 WL 4541118, at *18 (S.D. Fla. Oct. 9, 2008) (citing *Ellison v. Barnhart,* 355 F.3d 1272, 1276 (11th Cir.2003)). "In evaluating the necessity

for a remand, we are guided by 'whether the record reveals evidentiary gaps which result in unfairness or clear prejudice.'" *Brown v. Shalala*, 44 F.3d 931, 935 (11th Cir. 1995) (quoting *Smith v. Schweiker*, 677 F.2d 826, 830 (11th Cir. 1982)).

Here, the ALJ gave the opinions of Dr. Buigas, a state agency psychological consultant, and Dr. Conger, a state agency psychological consultant at the reconsideration level, significant weight as the consultants have subject matter expertise, and the opinions are consistent with the record evidence. [R. 53]. The ALJ then gave the opinion of Dr. Bukstel little weight. [R. 54]. The ALJ explained that Dr. Bukstel's opinion "is vague as it is unclear what 'trouble' the claimant would have if she was employed." *Id.* Next, the ALJ found it to be "unclear if the opinion is that she would have difficulty finding work or that she would not be able to maintain employment." *Id.* Finally, the ALJ noted that "the opinion that the claimant could not maintain employment is tantamount to a declaration that the claimant is disabled. The issue whether a claimant is disabled is an issue reserved to the Commissioner and such an opinion is entitled to no significant weight." *Id.*

While the ALJ did note two aspects of Dr. Bukstel's opinion which could have been clearer, these were not critical ambiguities. The Court finds that a full and fair record was developed and that there were no evidentiary gaps which resulted in unfairness or clear prejudice to Plaintiff. Moreover, the ALJ's evaluation of Plaintiff's mental impairment was supported by substantial record evidence—the notes and opinions of Drs. Fischer, Nam, Brown, and Sahadeo, and Plaintiff failed to carry his burden to show that a mental health impairment caused greater functional limitations than those assessed by the ALJ.

B. Whether substantial evidence supports the ALJ's evaluation of the medical opinion evidence

Plaintiff argues that Dr. Green, PA Kronzek, Dr. Labault-Santiago, and Dr. Brown all provided opinions that "showed a consistent level of limitations over multiple years" and that the ALJ erred in giving all of the opinions little weight. [DE 22 at pp. 18-19]. Plaintiff contends that the opinions of the four doctors are "clearly consistent with each other and the medical evidence of record", so the ALJ's "rejection of several supported opinions while favoring non-examining opinions is simply not supported." *Id.* at p. 19. Plaintiff additionally asserts that the non-examining psychological opinions were not based on much psychological evidence and that the opinions were given without the benefit of Dr. Bukstel's neuropsychological examination findings. *Id.*

Defendant argues that "substantial evidence supports the ALJ's decision to give greater weight to the reviewing physician's [sic] opinions than to the unsupported opinions from Plaintiff's treating providers." [DE 23 at p. 7]. Defendant specifically asserts that the ALJ's RFC finding is supported by the evidence and that the ALJ properly rejected the contrary opinions of Drs. Green, Brown, and Labault-Santiago. *Id.* at pp. 8-11. Defendant contends that "[b]ecause the ALJ properly rejected the contrary opinions from Plaintiff's treating and examining sources, the ALJ was free to give significant weight to the opinion of the state agency medical consultant, Drs. [sic] Thomas Bixler." *Id.* at p. 11. Defendant argues that the ALJ did not blindly rely on Dr. Bixler's opinion and notes that the ALJ's RFC was based on the evidence of record and included additional limitations for Plaintiff's right elbow impairment, which arose after Dr. Bixler issue his opinion. *Id.* Next, Defendant argues that the ALJ's findings regarding Plaintiff's mental limitations were properly based on the record evidence and the opinions of the

28

state agency psychological consultants and that the ALJ properly rejected the opinion from Dr. Bukstel, "which pertained to an issue reserved to the Commissioner." *Id.* at pp. 11-12. Defendant argues that the ALJ also relied, in part, on Dr. Bukstel's report and fairly characterized it in his decision. *Id.* at p. 12.

In reply, Plaintiff argues that the ALJ should not have given controlling or substantial weight to two non-examining state agency psychological consultants and one non-examining state agency medical consultant when they never treated Plaintiff. [DE 25 at p. 2]. Plaintiff also asserts that the ALJ should have given Dr. Labault-Santiago's opinion more weight because he "had the opportunity to provide a much more up to date and complete picture of Plaintiff's limitations and disability." *Id.* at p. 3. Plaintiff contends that the "fact that Dr. Labault-Santiago provided his opinion a short while after the evaluation is irrelevant here" and that the doctor's medical source statement is supported by the doctor's findings at Plaintiff's April 3, 2015 appointment. *Id.* at pp. 3-4. Plaintiff argues that Dr. Bixler's opinion is not corroborated, was given without an examination of Plaintiff and without "full view" of Plaintiff's records, and directly contradicts the opinions of Plaintiff's treating physicians. *Id.* at p. 4. Finally, with regard to Plaintiff's mental limitations, Plaintiff maintains that her hearing testimony established that she is limited in her activities and contradicts the ALJ's findings that she can participate in a variety of activities. *Id.* at p. 5. Plaintiff also asserts that Defendant has cited to the neuropsychological evaluation by Dr. Bukstel to support her arguments in her response, but Defendant has ignored Plaintiff's psychological screening and Dr. Bukstel's opinion that Plaintiff would have trouble being gainfully employed. *Id.* at pp. 6-7.

The Eleventh Circuit Court of Appeals has explained that an ALJ "may reject the opinion of any physician when the evidence supports a contrary conclusion," but that the ALJ is required

"to state with particularity the weight he gives to different medical opinions and the reasons why." *McCloud v. Barnhart*, 166 Fed.Appx. 410, 418-419 (11th Cir. 2006) (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983); *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987)). The opinion of a treating physician "must be given substantial or considerable weight unless 'good cause' is shown to the contrary." *Lewis*, 125 F.3d at 1440. "[G]ood cause" exists when the: "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips*, 357 F.3d at 1241. If the ALJ decides to disregard the opinion of a treating physician, the ALJ must clearly articulate his or her reasons for doing so. *Id.*

### Dr. Green and PA Kronzek

On March 21, 2013, upon examination of Plaintiff, Dr. Green noted that everything appeared normal except that Plaintiff's cervical range of motion was decreased to all planes with pain mildly, and palpation of the cervical spine was positive for minimal tenderness in the bilateral trapezius. [R. 346]. Dr. Green diagnosed Plaintiff with cervical strain and a face/scalp contusion. [R. 347]. He noted that Plaintiff's subjective complaints did not correspond to the objective clinical findings. *Id.* Dr. Green told Plaintiff that she should respond to conservative treatment and prescribed physical therapy. *Id.* Dr. Green determined that Plaintiff's activity should be modified, and she should not lift over five pounds or push or pull over 20 pounds. *Id.*

Plaintiff again saw PA David Kronzek on April 12, 2013, for a re-check of the injury. [R. 342]. PA Kronzek's examination showed no change from the March 21, 2013 examination. *Id.* PA Kronzek found that Plaintiff's activity should be modified so that she could lift no more than 10 pounds. [R. 344].

Plaintiff presented to David Kronzek, Dr. Green's physician's assistant, on May 13, 2013. [R. 341]. The physical examination did not show any new issues. *Id.* PA Kronzek noted that Plaintiff had gotten a CT scan of the brain, which was negative, and an electromyogram test and nerve conduction study of her left hand, which was negative. [R. 342]. PA Kronzek advised Plaintiff that they were running out of treatment options and that she could get another opinion. *Id.* He noted that Plaintiff's subjective complaints outweighed the objective exam. *Id.*

The ALJ explicitly considered the opinion evidence and gave Dr. Green's (and PA Kronzek's) "multiple restrictions" little weight as they were "temporary restrictions and in May 2013 Dr. Green released [Plaintiff] to regular activity." [R. 52]. Thus, the ALJ properly explained that he was giving Dr. Green's (and PA Kronzek's) opinion little weight and clearly explained his rationale for that finding.

Thus, the only remaining issue is whether the ALJ had good cause for not giving Dr. Green's (and PA Kronzek's) opinion considerable weight. The ALJ had good cause. Dr. Green's and PA Kronzek's examinations of Plaintiff revealed only mildly decreased cervical range of motion and minimal tenderness in the bilateral trapezius, Dr. Green (and PA Kronzek) found that Plaintiff's complaints did not correspond to the clinical findings, Dr. Green noted that conservative treatment should be effective, and PA Kronzek recommended that Plaintiff get another opinion. Given these findings, it is clear that Dr. Green's restrictions were not intended to be permanent.

### Dr. Labault-Santiago

On April 3, 2015, Plaintiff saw Dr. Jose Labault-Santiago for the first and only time. [R. 436]. Plaintiff scored a 16 out of 30 on a mini-mental state exam because of her decreased attention and concentration. [R. 437]. After completing a physical exam on Plaintiff, Dr.

Labault-Santiago noted that everything was normal except for giveaway weakness secondary to pain. [R. 438]. He determined that Plaintiff suffered from radiculopathies and carpal tunnel. *Id.* He started Plaintiff on conservative management to include physical/occupational therapy and preventative medication for the pain. [R. 438]. The doctor also found that Plaintiff's memory deficit was most likely caused by depression and anxiety. *Id.* He advised Plaintiff to continue seeing a psychiatrist. *Id.*

On May 29, 2015, Dr. Labault-Santiago completed a Medical Source Statement (Physical). [R. 414-415]. He noted that Plaintiff suffered from limitation of movement of the arms due to pain and that she could not stand for long periods. [R. 414]. The doctor opined that Plaintiff could not work on a regular basis without missing more than two days a month due to her disabilities. *Id.* He also found that Plaintiff could not stoop or climb, could not stand for long periods of time, could only occasionally lift or carry up to 10 pounds, could only occasionally use her hand for fine manipulation, and could only occasionally raise her left and right arms over her shoulders. *Id.* Dr. Labault-Santiago also found that Plaintiff's pain was both extreme and severe, that she had to periodically lie down due to fatigue (but did not say for how long), and that she would need to take unscheduled break periods during an eight-hour work day. [R. 415].

Dr. Labault-Santiago also completed a second undated Medical Source Statement (Physical). [DE 439-40]. The only differences in the undated version are that Dr. Labault-Santiago replied that Plaintiff could frequently (rather than occasionally) use her hands for fine manipulation, that Plaintiff's pain level was severe (rather than extreme and severe), and that Plaintiff did not have a reasonable medical need to lie down. *Id.*

The ALJ gave Dr. Labault-Santiago's undated medical source statement little weight as the record only reflects one visit with the doctor, the "short treatment history does not bolster the value

of these statements," the doctor's statement based on the April 2015 visit was signed over a month later, the opinions "are completed on a check-list form with no rationale to support the opined-to restrictions," there is no explanation as to why the two forms are not consistent with one another, and the opinion is not consistent with the evidence of record.  *Id.*

Once again the ALJ explicitly gave Dr. Labault-Santiago's opinion little weight and explained why, as required.  The Court finds that the ALJ had good cause to give the doctor's opinion little weight for the reasons stated in the ALJ's decision.  The Court also notes that the Medical Source Statements are clearly inconsistent with one another and are also inconsistent with Dr. Labault-Santiago's notes and the other record evidence.

### Dr. Brown

On May 29, 2015, Dr. Evlyn Brown completed a Medical Source Statement (Physical). [R. 416].  She noted that Plaintiff had nerve damage that caused her to have pain and numbness radiating down her right and left arm and into her hands and fingers.  *Id.*  Dr. Brown opined that Plaintiff could not work on a regular basis without missing more than two days a month due to her disabilities.  *Id.*  She also found that Plaintiff had limitations sitting, standing, walking, stooping and climbing.  *Id.*  Dr. Brown concluded that Plaintiff could frequently lift or carry up to five pounds and could only occasionally lift or carry up to 10 pounds, could never use her hands for fine manipulation, could only occasionally use her hands for gross manipulation, could only occasionally raise her left arm over her shoulder, and could never raise her right arm over her shoulder.  *Id.*  Dr. Brown also found that Plaintiff's pain was both extreme and severe, that she had to elevate her legs as needed, that she had to lie down due to fatigue as needed, and that she would need to take unscheduled break periods during an eight-hour work day.  [R. 415].

The ALJ gave Dr. Brown's medical source statement little weight as it was not consistent

with the medical evidence of record. [R. 53]. Since the ALJ explicitly gave the opinion little weight and explained why, the only issue is whether Dr. Brown's opinion was inconsistent with the objective medical evidence and Dr. Brown's own notes after she conducted physical examinations on Plaintiff. The Court finds that Dr. Brown's opinion was inconsistent. Taking into account all of the record evidence, which is summarized in detail above and is discussed throughout this Order, the ALJ had good cause to give Dr. Brown's opinion little weight on the basis that it was contradicted by the other record evidence.

Dr. Bukstel

As explained above, the ALJ opted to give the opinions of Dr. Buigas, a state agency psychological consultant, and Dr. Conger, a state agency psychological consultant at the reconsideration level, significant weight as the consultants have subject matter expertise, and the opinions are consistent with the record evidence. [R. 53]. The ALJ then gave the opinion of Dr. Bukstel little weight as it was vague and unclear, and any declaration that Plaintiff is disabled is an issue reserved to the Commissioner. [R. 54]. Since the ALJ properly explained that he was giving Dr. Bukstel's opinion little weight and clearly explained his rationale for that finding, the only remaining issue is whether the ALJ had good cause for not giving Dr. Bukstel's opinion considerable weight.

First, opinions on issues reserved to the Commissioner are not entitled to controlling weight or special significance. *See* 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1); *Denomme v. Comm'r, Soc. Sec. Admin.*, 518 Fed. App'x 875, 878 (11th Cir. 2013). Therefore, the ALJ was not required to rely on Dr. Bukstel's conclusion that Plaintiff was disabled.

Second, the ALJ properly found that Dr. Bukstel's opinion was vague and unclear as it was internally inconsistent. On May 11, 2015, Dr. Lee H. Bukstel completed a "Preliminary Report."

[R. 573]. Dr. Bukstel opined that the available evidence raised concerns that Plaintiff could have some kind of cognitive disorder. [R. 575]. Dr. Bukstel also opined that "[o]ther secondary influences that could also contribute to cognitive inefficiency are anxiety, pain, sleep disturbance, hearing loss, and tiredness. It is also difficult to know to what extent, if any, being on multiple medications could contribute to some cognitive inefficiency." *Id.* Dr. Bukstel recommended that Plaintiff be evaluated from a "neuropsychological standpoint." *Id.*

On September 2, 2015, Dr. Bukstel completed his "Brief Preliminary Neuropsychological Report." [R. 576]. Dr. Bukstel noted that Plaintiff appeared quite depressed. *Id.* He explained that testing showed a pattern of many intact abilities, generally within the low average to average range, and some deficits that are generally mild. *Id.* Dr. Bukstel noted that Plaintiff had some slight perseverative thinking tendency and some inefficiency on short delay free recall and long delay recognition recall. *Id.* He also noted that Plaintiff made multiple intrusion and repetition errors and had deficits in the areas of reading and expressive vocabulary, verbal symbolic abstract reasoning, rhythm pattern perception, left hand simple motor speed, bilateral fine motor dexterity, simple visual executive functioning, auditory comprehension of verbal material, verbal fluency for phonemic and conceptual cutes, and verbal confrontation naming. [R. 577-78]. Dr. Bukstel found that there was also evidence of moderate inadequacy of explaining a simple statement heard and mild errors of confusion in calculating. [R. 578].

Dr. Bukstel next reported that psychological screening of Plaintiff revealed evidence of severe depression with some suicide preoccupations, severe anxiety, and severe hopelessness regarding the future. [R. 578]. He explained that Plaintiff had many notable stressors. *Id.* Dr. Bukstel concluded that evidence showed selected neuropsychological impairment. *Id.* He found that Plaintiff's neuropsychological inefficiency is likely multi-factorial, caused by her severe

depression and anxiety, chronic pain, sleep disturbance, daytime fatigue and tiredness, and left ear hearing loss. *Id.* Dr. Bukstel found there was no obvious evidence of any type of dementing process. *Id.* He concluded that Plaintiff's "neurophysical inefficiency is likely mostly due to non-neurologic factors" and that continued neurological monitoring might be necessary. *Id.* Dr. Bukstel opined that Plaintiff would likely have trouble being gainfully employed (at the time of his report), but that, if her depression, anxiety and pain improved with treatment, she could possibly return to work. *Id.*

In her Motion and Reply, Plaintiff points out the portions of the reports that support her disability application. In Defendant's Response, she points out portions of the reports that support the ALJ's decision. The fact that each party can find parts of the opinion that support their arguments in support of summary judgment illustrates how internally inconsistent Dr. Bukstel's opinion is. For example, Dr. Bukstel found that the Plaintiff's evaluation showed a pattern of many intact abilities, generally within the low average to average range, and some deficits that are generally mild and that there was no obvious evidence of any type of dementing process. Yet, he also found that Plaintiff would likely have trouble being gainfully employed and that non-neurologic factors were causing her neurophysical inefficiency.

Furthermore, Dr. Bukstel's opinion is inconsistent with the record evidence. The notes and opinions of Drs. Fischer, Nam, and Sahadeo, and the state agency psychological consultant are all at odds with Dr. Bukstel's opinion. In sum, the ALJ had good cause to give Dr. Bukstel's opinion little weight.

### Non-examining Physicians

Finally, with regard to all of the treating physicians above, the Court finds that the ALJ did not err in assigning more weight to the opinions of the state examiners than to the opinions of some

of the treating physicians. "Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion." 20 C.F.R. § 404.1527(c)(4). The opinion of a non-examining reviewing physician is entitled to little weight and, taken alone, does not constitute substantial evidence to support an administrative decision. *Swindle v. Sullivan,* 914 F.2d 222, 226 n.3 (11th Cir. 1990).

This Court is not permitted to re-weigh the evidence. However, the Court does find that the ALJ's determination that the state examiners' medical and psychological opinions are consistent with a majority of the medical evidence of record, specifically the MRI's and other objective tests and the findings of Drs. Fischer, Nam, Sahadeo, Salmon-Trajan, Ackerman, Simpson, and Gervin and PA Darquea, discussed *supra*, is correct. Further, the ALJ explicitly noted that he reviewed the entire record and that his RFC assessment was supported by the record, including objective findings and medical opinions.

Additionally, the ALJ did not rely on those opinions of the non-examining physicians alone. For example, the ALJ explicitly added additional limitations to Plaintiff's RFC in light of the fact that Plaintiff's right elbow impairment developed after the date of the consultant's opinion. Thus, the ALJ did not commit error in assigning more weight to the state examiners' opinions than to the treating physicians' opinions, especially in a case such as this one where Plaintiff saw many different doctors and saw doctors for so few visits.

## IV. CONCLUSION

In light of the foregoing, it is hereby **ORDERED AND ADJUDGED** that the decision of the Commissioner is **AFFIRMED**. Accordingly, Plaintiff's Motion for Summary Judgment [DE 22] is hereby **DENIED**, and Defendant's Motion for Summary Judgment [DE 23] is hereby **GRANTED**.

**ORDERED AND ADJUDGED** in Chambers at West Palm Beach, Palm Beach County,

Florida, this __26th__ day of February, 2018.

WILLIAM MATTHEWMAN
United States Magistrate Judge